159 MP Corp. v Redbridge Bedford, LLC (2018 NY Slip Op 00537)





159 MP Corp. v Redbridge Bedford, LLC


2018 NY Slip Op 00537


Decided on January 31, 2018


Appellate Division, Second Department


Dillon, J.P., J.



Published by New York State Law Reporting Bureau pursuant to Judiciary Law § 431.


This opinion is uncorrected and subject to revision before publication in the Official Reports.



Decided on January 31, 2018
SUPREME COURT OF THE STATE OF NEW YORK
Appellate Division, Second Judicial Department

MARK C. DILLON, J.P.
CHERYL E. CHAMBERS
COLLEEN D. DUFFY
FRANCESCA E. CONNOLLY, JJ.


2015-01523
 (Index No. 4599/14)

[*1]159 MP Corp., et al., appellants,
v
Redbridge Bedford, LLC, respondent.



APPEAL by the plaintiffs, in an action, inter alia, for a judgment declaring that two commercial leases are in full force and effect and that the plaintiffs are not in violation of their obligations under the leases, from an order of the Supreme Court (David I. Schmidt, J.) dated January 29, 2015, and entered in Kings County, which denied their motion for a Yellowstone injunction (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630) and granted the defendant's cross motion for summary judgment dismissing the complaint. Justice Dillon has been substituted for former Justice Dickerson (see 22 NYCRR 670.1[c]).



Wenig Saltiel LLP, Brooklyn, NY (Meryl L. Wenig and Leslie Perez-Bennie of counsel), for appellants.
Lupkin & Associates PLLC, New York, NY (Jonathan D. Lupkin and Rebecca C. Smithwick of counsel), for respondent.



DILLON, J.P.


OPINION & ORDER
This appeal raises an issue of first impression in the appellate courts of New York, which was identified in an Outside Counsel article in the New York Law Journal in 2014 [FN1]. Specifically, we address the question of whether written leases negotiated at arm's length by commercial tenants may include a waiver of the right to declarative relief that is enforceable at law or, alternatively, whether such a waiver is void and unenforceable as a matter of public policy.
For reasons set forth below, we conclude that under the circumstances of this case, the commercial tenants' voluntary and limited waiver of declaratory judgment remedies in their written leases is valid and enforceable, and not violative of New York's public policy, particularly as the tenants in this instance did not waive other available legal remedies.
I. Factual and Procedural Background
On April 7, 2010, the plaintiffs, 159 MP Corp. and 240 Bedford Ave Realty Holding Corp., entered into leases for 10,000 square feet of retail space and 3,000 square feet of storage space, respectively, at premises located at 159 North 3rd Street, also known as 241 Bedford Avenue, also known as 160 North 4th Street, in Brooklyn. The original landlord on the leases, BFN Realty Associates, LLC, was later succeeded by the defendant, Redbridge Bedford, LLC. Each lease was to run for 20 years from May 1, 2010, with a 10-year renewal option.
Paragraph 67(H) in the rider of each lease provided that the tenant:
"waives its right to bring a declaratory judgment action with respect to any provision of this Lease or with respect to any notice sent pursuant to the provisions of this Lease. Any breach of this paragraph shall constitute a breach of substantial obligations of the tenancy, and shall be grounds for the immediate termination of this Lease. It is further agreed that in the event injunctive relief is sought by Tenant and such relief shall be denied, the Owner shall be entitled to recover the costs of opposing such an application, or action, including its attorney's fees actually incurred, it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings."
Four years later, on March 12, 2014, the defendant issued to each of the plaintiffs a "Ten (10) Day Notice to Cure Violations" (hereinafter Notice to Cure) arising out of their alleged breaches of stated paragraphs of the leases and their riders. The plaintiffs' alleged breaches included the failure to obtain various permits, the arrangement of the premises in a manner that created fire hazards, the existence of nuisances and noises, and the failure to allow for sprinkler system inspections by the Fire Department. The Notices to Cure demanded that the alleged lease violations be cured by March 27, 2014, which was 15 days from the date of the documents, otherwise the defendant would terminate the tenancies and thereafter commence summary proceedings to recover possession of the premises.
On or about March 19, 2014, the plaintiffs commenced an action in the Supreme Court for declaratory and injunctive relief, and to recover damages for breach of contract. Specifically, the first cause of action was for a judgment declaring that the leases are in full force and effect and that there are no lease violations as alleged by the defendant. The second cause of action was for preliminary and permanent injunctive relief, enjoining the defendant from taking any steps to terminate the leases. The third cause of action was for a judgment declaring that the defendant is equitably estopped from terminating the leases based on usages of the premises of which the defendant had been aware without objection. The fourth cause of action sought money damages for the defendant's own breaches of contract.
On March 26, 2014, prior to the expiration of the stated cure period, the plaintiffs moved by order to show cause for a Yellowstone injunction (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630) staying and tolling the cure period and enjoining the defendant from terminating the leases or commencing a summary proceeding for eviction. In their supporting papers, the plaintiffs argued that although they disputed the claim that they had violated the leases, they were nevertheless ready, willing, and able to cure any breaches of the leases if obligated to do so. The plaintiffs maintained that the defendant, as the property owner, was instead responsible for the necessary permits and certificates of occupancy, and that the defendant had waived its other objections by having accepted years of rent payments with knowledge of the alleged violations.
The defendant interposed an answer dated April 25, 2014, denying the material allegations of the complaint and asserting an affirmative defense that the plaintiffs "have contractually waived the right to seek injunctive relief." Contemporaneously, the defendant cross-moved for summary judgment dismissing the complaint based on the waiver language of Paragraph 67(H) in the two lease riders, contending that the mere commencement of the declaratory judgment action constituted contractual grounds for terminating the tenancies.
In opposition to the cross motion, the plaintiffs argued that the provision of the leases waiving the right to declaratory relief did not separately prohibit Yellowstone injunctions. Further, the plaintiffs argued that a blanket covenant not to sue cannot be interpreted to extend to actions to enforce the obligations of the leases at issue.
In the order appealed from, dated January 29, 2015, the Supreme Court denied the plaintiffs' motion for Yellowstone relief. The court reasoned that although the leases did not expressly prohibit Yellowstone applications, such relief was nevertheless encompassed within the broader provisions of Paragraph 67(H) in the riders that prohibited declaratory judgment actions. The court construed the waiver of declaratory remedies as an agreement to instead resolve contractual disputes through the mechanism of summary proceedings. The court further noted that the waiver of declaratory remedies did not prevent any of the parties from performing the agreements, or from commencing actions seeking damages for either breach of contract or tortious conduct. The court did not address whether the plaintiffs' waiver of declaratory judgment remedies [*2]in Paragraph 67(H) of the riders violated public policy, as the issue had neither been raised in the pleadings nor in any of the papers submitted in connection with the plaintiffs' motion or the defendant's cross motion. Finding that all the plaintiffs' claims were actual or disguised causes of action for declaratory relief, the court denied the plaintiffs' motion and granted the defendant's cross motion for summary judgment dismissing the complaint.
On March 2, 2015, this Court granted the plaintiffs' application for a temporary stay of the defendant's enforcement remedies, which was thereafter extended by a decision and order on motion of this Court dated March 26, 2015, pending the determination of this appeal.
II. Yellowstone Injunctions Generally
A Yellowstone injunction is not a creature of statute (see CPLR article 63). It is, instead, a creation of case law originating in 1968 with the decision of the Court of Appeals in First Natl. Stores v Yellowstone Shopping Ctr. (21 NY2d 630). While Yellowstone is a relatively brief opinion, its brevity should not be interpreted as lacking in importance since Yellowstone's impact in landlord-tenant litigation is as strong today as it was when it was rendered nearly 50 years ago (see Mark C. Dillon, The Extent to Which "Yellowstone Injunctions" Apply in Favor of Residential Tenants: Who Will See Red, Who Can Earn Green, and Who May Feel Blue?, 9 Cardozo Pub. L. Pol'y & Ethics J. 287, 312 [2011]).
In Yellowstone, the landlord of commercial premises was contractually obligated to provide its tenant with a 10-day notice to cure for any default in the tenant's performance of the lease, and the tenant's failure to cure permitted the landlord to terminate the lease, re-enter the premises, and evict the tenant (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d at 634-635). The landlord served the tenant with a 10-day default notice for the tenant's failure to comply with a sprinkler order issued by the Fire Department. In response, the tenant commenced an action for a judgment declaring that sprinkler compliance was the responsibility of the landlord rather than the tenant. Nine days later, the tenant moved by order to show cause for a preliminary injunction to enjoin the landlord from enforcing its remedies under the lease. However, the tenant did not seek a temporary restraining order (hereinafter TRO) to prevent the landlord from enforcing default remedies while the motion for a preliminary injunction was pending. Absent a TRO, the cure period expired, and the landlord terminated the lease. The Supreme Court ultimately declined to exercise jurisdiction over the matter, finding that the tenant's defenses could be asserted in a summary proceeding (see id. at 635). On appeal to this Court, we reached the merits of the declaratory judgment action by unanimously finding that the tenant was the party responsible for sprinkler compliance under the relevant language of the lease (see id.). However, this Court split 3-2 on the collateral question of whether to recognize the tenant's request for a preliminary injunction. The majority, invoking powers of equity, noted that since the tenant had acted in apparent good faith by promptly initiating its declaratory judgment action, it would be harsh and inequitable to allow a termination of the lease and the tenant's eviction from the premises (see id. at 637). This Court therefore permanently enjoined the landlord from commencing a summary proceeding on the condition that the tenant install and pay for a sprinkler system within 20 days (see id.). The dissent reasoned that since the tenant had, in fact, defaulted, and the lease was terminated while no injunction was in place, the courts were without authority to even recognize a continuing landlord-tenant relationship between the parties (see First Natl. Stores v Yellowstone Shopping Ctr., 28 AD2d 873, 874).
On further appeal, the Court of Appeals, while agreeing with this Court that the tenant had breached a provision of its lease by failing to install a sprinkler system at the premises, nonetheless agreed with the dissent that given the landlord's 10-day notice to cure and the lease's termination thereafter, the Supreme Court had no basis to fashion any relief for the tenant, legal, equitable, or otherwise (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d at 637-638).
Yellowstone is a case where the result might well have been different had the tenant sought and obtained a TRO at the outset of the litigation, to preserve the status quo and continue the lease while the declaratory judgment action was pending. Such are the vagaries and pitfalls of litigation. The true importance of the case is its implicit acceptance of a commercial tenant's presumptive right of action to extend noticed cure periods and thereby forestall or avoid lease terminations and evictions until the merits of commercial lease disputes can be resolved by the courts (see Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d 508, 514; Post v 120 E. End Ave. Corp., 62 NY2d 19, 25; Korova Milk Bar of White Plains, Inc. v PRE Props., LLC, 70 AD3d 646, 647; Hopp v Raimondi, 51 AD3d 726, 727).
In the years since the Yellowstone case was decided in 1968, the courts have defined the four elements that tenants must establish for Yellowstone injunctions: (1) the existence of a commercial lease, (2) the issuance by the landlord of a notice of default, notice to cure, or threat of termination of the lease, (3) an application for a TRO made prior to the expiration of the cure period, and (4) the tenant's desire and ability to cure any alleged default by means short of vacating the premises (see Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 514; Korova Milk Bar of White Plains, Inc. v PRE Props., LLC, 70 AD3d at 647; Caldwell v American Package Co., Inc., 57 AD3d 15, 20; Xiotis Restaurant Corp. v LSS Leasing Ltd. Liab. Co., 50 AD3d 678, 679; Hempstead Video, Inc. v 363 Rockaway Assoc., LLP, 38 AD3d 838, 839). These elements are less stringent than those required for the issuance of standard preliminary injunctive relief under CPLR article 63 (see Post v 120 E. End Ave. Corp., 62 NY2d at 25-26; Marathon Outdoor v Patent Constr. Sys. Div. of Harsco Corp., 306 AD2d 254, 255). Perhaps the most contentious of the Yellowstone elements are the third element regarding the timing of the application for injunctive relief, and the fourth element regarding the tenant's desire and ability to cure alleged lease breaches.
III. Whether Yellowstone Relief Was Timely Sought in This Action
We note that the plaintiffs timely sought Yellowstone relief at the trial and appellate levels, thereby effectively extending the cure period, and thus, the appeal has not been rendered academic.
The Notices to Cure were dated March 12, 2014, and provided the plaintiffs with 15 days, until March 27, 2014, to cure the alleged breaches. The plaintiffs moved in the Supreme Court for Yellowstone relief on March 26, 2014, one day before the cure period expired. The Supreme Court's order effectively lifting the temporary stay, although dated January 29, 2015, was not entered prior to March 2, 2015, the day the plaintiffs sought and obtained from this Court a temporary stay of any action that would terminate their leases, subject them to summary proceedings, or evict them from the premises. The temporary stay was extended by this Court on March 26, 2015, pending the determination of this appeal. As such, the plaintiffs are not in the same posture as the tenants in Yellowstone, where the cure period had expired before any court could reach the merits of the parties' claims and defenses.
IV. Whether Yellowstone Relief May Be Sought Here
By nature and definition, a Yellowstone injunction is inextricably intertwined with the court's role in resolving whether a tenant has breached provisions of the lease and, if so, whether any such breach shall be cured. As here, a tenant's preemptive action to have the court determine that the lease has not been breached is in the nature of declaratory judgment (see CPLR 3001; see e.g. Hughes v Lenox Hill Hosp., 226 AD2d 4, 13).
A practical interpretation of the language of Paragraph 67(H) in the parties' lease riders is that declaratory relief that is waived by the tenants includes Yellowstone relief such as that sought here from the Supreme Court (see 403 W. 43 St. Rest. Inc. v Ninth Ave. Realty, LLC, 36 AD3d 464). This is true in light of other language, also contained within Paragraph 67(H), that
"[i]t is further agreed that in the event injunctive relief is sought by Tenant and such relief shall be denied, the Owner shall be entitled to recover the costs of opposing such an application, or action, including its attorney's fees actually incurred, it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings" (emphasis added).
The plaintiffs' argument that there is a distinction between a prohibited declaratory judgment action on the one hand, and permissible Yellowstone relief on the other, is of no moment, as the latter cannot exist without the former. By nature and definition, a Yellowstone injunction springs from the declaratory judgment action that gives rise to it. By contrast, breach of contract actions commenced by tenants lend themselves to standard injunctive remedies under CPLR article 63 (see e.g. South Amherst, Ltd. v H.B. Singer, LLC, 13 AD3d 515, 516-517; Wendling v 136 E. 64th St. Assoc., 128 AD2d 419, 421). Accordingly, we hold that insofar as the plaintiffs expressly waived both declaratory and Yellowstone relief pursuant to the terms of Paragraph 67(H) in their lease riders, the Supreme Court properly denied their motion for a Yellowstone injunction and granted those branches of the defendant's cross motion which were for summary judgment dismissing the first, second, and third causes of action.
[*3]V. Public Policy
As a threshold matter, the plaintiffs, in opposing the defendant's cross motion for summary judgment, argued that the defendant's proof was insufficient, that injunctive relief was independent of declaratory relief, that the waiver was a product of mutual mistake, that the defendant was the party in breach of contract, and that equitable estoppel barred the defendant from relying on the waiver language of Paragraph 67(H). They never argued that the waiver language of Paragraph 67(H) was unenforceable on public policy grounds [FN2]. Moreover, in the order appealed from, the Supreme Court did not discuss public policy. Accordingly, we agree with the defendant that any issue of whether the waiver of declaratory relief violates public policy is being raised for the first time on appeal. Generally, an issue raised for the first time on appeal is improperly before this Court and will not be considered (see Matter of 148 S. Emerson Partners, LLC v 148 S. Emerson Assoc., LLC, ___ AD3d ___, 2018 NY Slip Op 00423 [2d Dept 2018]). However, "[w]here a contract provision is arguably void as against public policy, that issue may be raised for the first time at the Appellate Division by a party, or by the court on its own motion" (Matter of Niagara Wheatfield Adm'rs Assn. [Niagara Wheatfield Cent. School Dist.], 44 NY2d 68, 72). We therefore reach the merits of the public policy issue raised on appeal.
The plaintiffs and our dissenting colleague maintain that even if the waiver provision of Paragraph 67(H) is interpreted as prohibiting both declaratory and Yellowstone relief, the waiver is nevertheless unenforceable as against public policy. We disagree.
The defendant, in support of its cross motion, established its prima facie entitlement to judgment as a matter of law dismissing the first, second, and third causes of action for declaratory and injunctive relief by submitting the two subject leases with their waiver provisions (see generally Giuffrida v Citibank Corp., 100 NY2d 72, 81; Winegrad v New York Univ. Med. Ctr., 64 NY2d 851, 853; Friends of Animals v Associated Fur Mfrs., 46 NY2d 1065, 1067). The burden then shifted to the plaintiffs to raise a triable issue of fact as to whether the waiver provision of Paragraph 67(H) is void as against public policy (see generally Alvarez v Prospect Hosp., 68 NY2d 320, 324; Zuckerman v City of New York, 49 NY2d 557, 562; Friends of Animals v Associated Fur Mfrs., 46 NY2d at 1068).
For the three distinct reasons that follow, the plaintiffs failed to meet their burden.
A bedrock principle of our jurisprudence is the right of parties to freely enter into contracts. So fundamental is the right to contract without interference from any state, that it is ensconced in Article 1, Section 10, Clause 1 of the United States Constitution. Not only is the freedom to contract constitutionally protected, but federal and New York courts have recognized that the autonomy of parties to contract is itself a sacred and protected public policy that should not be interfered with lightly (see Baltimore & Ohio Southwestern R. Co. v Voight, 176 US 498, 505-506; New England Mut. Life Ins. Co. v Caruso, 73 NY2d 74, 81; Miller v Continental Ins. Co., 40 NY2d 675, 679).
Indeed, our jurisprudence provides citizens with the freedom and opportunity to abandon rights and privileges (see Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d 96, 104; Hannigan v Hannigan, 104 AD3d 732, 734; Town of Hempstead v Incorporated Vil. of Freeport, 15 AD3d 567, 569). Rights that may be abandoned, of both constitutional and statutory dimension, include many that are otherwise inviolate. Examples abound, such as the waiver of the constitutional right to a jury at civil trials (see NY Const, art I, § 2; CPLR 4102[a]; DiStephan v DiStephan, 106 AD2d 603, 607; O'Brien v Moszynski, 101 AD2d 811, 812) and even criminal trials (see NY Const, art I, § 2; CPL 320.10; People v Smith, 6 NY3d 827, 828), the waiver of the constitutional right to indictment by a State grand jury (see NY Const, art I, § 6; CPL 190.10, 190.20), the waiver of the right against self-incrimination (see Miranda v Arizona, 384 US 436, 444), the waiver of the right to counsel (see NY Const, art I, § 6; People v McIntyre, 36 NY2d 10, 15), the waiver of the right to appeal (see People v Seaberg, 74 NY2d 1, 9-10), waivers in the nature of noncompete clauses that are reasonable in time and area (see BDO Seidman v Hirshberg, 93 NY2d 382, 388-389; Thomas A. Sbarra Real Estate, Inc. v Lavelle-Tomko, 117 AD3d [*4]1210, 1211; Gimper, Inc. v Giacchetta, 221 AD2d 682, 683-684), radius clauses in marital separation and settlement agreements (see e.g. Matter of Rodriguez v Gasparino, 218 AD2d 739, 740), reasonable contractual reductions of the applicable statute of limitations (see CPLR 201; White v Continental Cas. Co., 9 NY3d 264, 267; John J. Kassner & Co. v City of New York, 46 NY2d 544, 550-551; Sapinkopf v Cunard S.S. Co., Ltd., 254 NY 111, 114; City of Yonkers v 58A JVD Indus., Ltd., 115 AD3d 635, 637-638), contractual choice of law provisions where the law of the selected forum is not " truly obnoxious'" to New York law (Welsbach Elec. Corp. v MasTec N. Am., Inc., 7 NY3d 624, 629, quoting Cooney v Osgood Mach., 81 NY2d 66, 79; see General Obligations Law § 5-1401[1]), contractual venue-selection provisions (see Karlsberg v Hunter Mtn. Ski Bowl, Inc., 131 AD3d 1121, 1122; Trump v Deutsche Bank Trust Co. Ams., 65 AD3d 1329, 1331), liquidated damages clauses that do not amount to penalties (see Truck Rent-A-Ctr. v Puritan Farms 2nd, 41 NY2d 420, 424), contractual waivers to personal jurisdictional defenses (see Alfred E. Mann Living Trust v Etirc Aviation S.A.R.L., 78 AD3d 137, 140-141; cf. Hunt Constr. Group, Inc. v Oneida Indian Nation, 53 AD3d 1048, 1049-1050), indemnification agreements where the indemnitor does not contract away liability for its own negligence (see General Obligations Law § 5-322.1; see also Brooks v Judlau Contr., Inc., 11 NY3d 204, 209; Lazarro v MJM Indus., 288 AD2d 440, 441), and agreements to submit disputes to arbitration (see CPLR 7501; Matter of Waks, 59 NY2d 723, 725-726; Matter of New York City Tr. Auth. v Amalgamated Tr. Union of Am., AFL-CIO, Local 1056, 284 AD2d 466, 468).
Leases, in particular, are known for the rights that tenants oftentime waive within the four corners of the documents. For example, tenants surrender rights by agreeing to the waiver of the right to a jury trial in nonpayment proceedings (see e.g. Phoenix Garden Rest. v Chu, 234 AD2d 233), the waiver of counterclaims (see Trump Vil. Section 2 v Semler, 111 Misc 2d 167 [Civ Ct, Kings County]), nonexcessive late fees for the untimely payment of rent (cf. Rock v Klepper, 23 Misc 3d 1103[A], 2009 NY Slip Op 50558[U], *7 [Plattsburgh City Ct]; Dashnaw v Shiflett, 10 Misc 3d 1051[A], 2005 NY Slip Op 51874[U], *3 [Plattsburgh City Ct]), automatic rent escalation clauses (see CBS Inc. v P.A. Bldg. Co., 200 AD2d 527; 75 Henry St. Garage v Whitman Owner Corp., 79 AD2d 1001), and rent acceleration clauses upon the tenants' default (see Fifty States Mgt. Corp. v Pioneer Auto Parks, 46 NY2d 573, 577; Ross Realty v V & A Iron Fabricators, Inc., 5 Misc 3d 72, 73 [App Term, 2d Dept]).
Conversely, the State Legislature has enacted protections for tenants that explicitly identify rights that may not be validly waived by them in oral or written leases. These statutory prohibitions include any waivers to the right of habitability (see RPAPL 235-b; Park W. Mgt. Corp. v Mitchell, 47 NY2d 316, 326), the right to written receipts for rent paid (see RPAPL 235-e), the right to nonelectronic billing (see RPAPL 235-g[1], [2]), the right of deceased tenants' estates to assign the leases to others (see RPAPL 236; Joint Props. Owners v Deri, 113 AD2d 691, 694), the right of tenants to bear children during the term of the lease (see RPAPL 237), the right of tenants to recover attorneys' fees if successful in defending summary proceedings on the merits, where a reciprocal right exists in favor of the landlord in the lease (see RPAPL 234; Graham Ct. Owner's Corp. v Taylor, 115 AD3d 50, 56, affd 24 NY3d 742), the right of tenants to seek damages for injuries to persons or property caused by the negligence of the landlord (see General Obligations Law § 5-321; Wagner v Waterman Estates, LLC, 128 AD3d 1504, 1507; Ben Lee Distribs., Inc. v Halstead Harrison, 72 AD3d 715, 716), and the right of tenants in six or more multi-unit dwellings to have rent security deposited for their benefit into interest-bearing bank accounts (see General Obligations Law § 7-103[2-a]; Mancini v DMJ Mgt. Corp., 195 Misc 2d 656, 657-658 [Mount Vernon City Ct]). The State Legislature has not enacted any specific or blanket statutory provision prohibiting as void or unenforceable a tenant's waiver of declaratory judgment remedies (cf. RPAPL 235-c). Therefore, this Court, which is not a legislative body, should not attempt to create such a blanket prohibition here.
Waivers of rights should not be lightly presumed and, in the contractual context, must reflect a clear manifestation of intent to relinquish the protections that are otherwise afforded to the waiving party (see Fundamental Portfolio Advisors, Inc. v Tocqueville Asset Mgt., L.P., 7 NY3d at 104, quoting Gilbert Frank Corp. v Federal Ins. Co., 70 NY2d 966, 968; Stassa v Stassa, 123 AD3d 804, 805-806). But even if the consideration for a waiver is grossly unequal or of dubious value, the adequacy of consideration is not subject to judicial review absent fraud or unconscionability (see Apfel v Prudential-Bache Sec., 81 NY2d 470, 475; Moezinia v Ashkenazi, 136 AD3d 988, 989).
Here, the parties were sophisticated entities that negotiated at arm's length and [*5]entered into lengthy and detailed leases defining each party's rights and obligations with great apparent care and specificity. While standardized lease forms were used, the record reflects that each such lease agreement consisted of 39 paragraphs of initial or boilerplate terms, 9 paragraphs of "Rules and Regulations" incorporated into the leases by reference, a rider consisting of 36 paragraphs, and several initialed handwritten changes and deletions. Paragraph 67(H) in each rider contains the provision by which the tenants waived their right to declaratory judgment actions, in favor of, instead, expressly adjudicating disputes via summary proceedings.
The right to a declaratory judgment, inclusive of the Yellowstone relief sought here, is not so vaulted as to be incapable of self-alienation [FN3]. As noted earlier, Yellowstone remedies are not a creature of any constitution or statute. As conceded by our dissenting colleague, the principle of not enforcing contracts on grounds of public policy "must be cautiously applied" (Steele v Drummond, 275 US 199, 204). To hold that the waiver of declaratory judgment remedies in contractual leases between sophisticated parties is unenforceable as a matter of public policy does violence to the notion that the parties are free to negotiate and fashion their contracts with terms to which they freely and voluntarily bind themselves. The fact that with the benefit of hindsight, a party believes that it had agreed to an unfavorable contractual term, does not provide courts with authority to rewrite the terms of a contract or to extricate parties from poor bargains (see New England Mut. Life Ins. Co. v Caruso, 73 NY2d at 81). Rather, parties to contracts must ordinarily remain free to make the agreements they wish, on terms they deem satisfactory, no matter how unwise it might appear to a third party (see Rowe v Great Atl. & Pac. Tea Co., 46 NY2d 62, 69) or to a party with the benefit of 20/20 hindsight. As aptly noted by the Court of Appeals, absent counteravailing public policy, if parties "are dissatisfied with the consequences of their agreement, the time to say so [was] at the bargaining table'" (Oppenheimer & Co. v Oppehneim, Appel, Dixon & Co., 86 NY2d 685, 695, quoting Maxton Bldrs. v Lo Galbo, 68 NY2d 373, 382; see Bloomfield v Bloomfield, 97 NY2d 188, 193; Miller v Continental Ins. Co., 40 NY2d at 679). Here, the plain language of the lease riders reflects the parties' mutual intent to adjudicate disputes by means of summary proceedings. Declaratory and Yellowstone remedies are rights private to the plaintiffs that they could freely, voluntarily, and knowingly waive. We therefore enforce the waivers in the lease riders and decline to strike them (see Fisk Bldg. Assoc. LLC v Shimazaki II, Inc., 76 AD3d 468, 469; Hamza v Alphabet Soup Assoc., LLC, 2011 NY Slip Op 30973[U] [Sup Ct, NY County] [Yellowstone waiver]; Aloyts v 601 Tenant's Corp., 2007 WL 6938117 [Sup Ct, Kings County, index No. 30043/06 ] [Yellowstone waiver]).
A further reason that the declaratory judgment waiver in this case cannot be held to be unconscionable involves the record on appeal. We cannot ascertain from the record what good and valuable consideration the tenants may have received in exchange for their declaratory judgment waivers. Likely, all consideration exchanged by any party was aggregated within the broader bargains reached. Nevertheless, the plaintiffs, bearing the burden of demonstrating a triable issue of fact as to whether the waiver provisions violate public policy, are unable to do so where the record is silent as to the consideration they received in exchange for their waivers.
VI. The Plaintiffs' Available Remedies
Our dissenting colleague argues that since in-possession lessees have no statutory authority to commence summary proceedings under RPAPL 721, our enforcement of the declaratory judgment waiver provision leaves the plaintiffs without affirmative judicial remedies. Respectfully, the argument fails, and thus presents the third and final reason for affirming the order appealed from.
The waiver provision is, itself, a limited one, thereby mitigating the public policy concerns. While the right to bring a declaratory judgment action was surrendered in Paragraph 67(H) in the lease riders, other judicial remedies remained available to the plaintiffs. Indeed, despite the provisions of Paragraph 67(H), the plaintiffs had the contractual right to receive notices to cure and an opportunity to correct any claimed breaches. The plaintiffs did not expressly surrender the right to seek money damages from the defendant if the defendant were to breach the contract or commit tortious conduct injurious to persons or property (see General Obligations Law § 5-321). The plaintiffs also did not surrender the right to fully litigate and defend themselves in any summary proceeding that the defendant might commence in Civil Court (see Aloyts v 601 Tenant's Corp., [*6]2007 WL 6938117 [Sup Ct, Kings County, index No. 30043/06]).
Moreover, as a practical matter, the plaintiffs necessarily remain in possession of the demised premises if no summary proceeding is commenced against them, in which case inconvenience or prejudice to the plaintiffs is significantly reduced, if not eliminated altogether. If a summary proceeding is commenced, the plaintiffs are permitted to present whatever factual and legal defenses may be available to them. If the plaintiffs are vindicated at any such summary proceeding, they may continue to quietly enjoy possession of the premises without legal molestation. If the plaintiffs are unsuccessful with their summary proceeding defenses, they are, absent a mutual settlement of issues, properly evicted from the premises from which they would have no further right to use and enjoy and no procedural cause to complain.
VII. The Absence of Mutual Mistake
The plaintiffs describe the existence of Paragraph 67(H) in the lease riders as a product of mutual mistake.
However, the parties' mutual intent to proceed in summary fashion could not have been more clearly expressed than it was in Paragraph 67(H), where they agreed that "it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings." Indeed, the parties' meeting of minds on the waiver of the plaintiffs' right to commence a declaratory judgment action is abundantly clear, as Paragraph 67(H) contained further language providing that any breach of that term "shall constitute a breach of substantial obligations of the tenancy, and shall be grounds for the immediate termination of this Lease." Such unequivocal language belies the plaintiffs' contention that the declaratory judgment waiver is, or could have been, a product of mutual mistake.
As noted earlier, Paragraph 67(H) also subjects the plaintiffs to the payment of costs and attorneys' fees incurred by the defendant in the event any declaratory judgment action commenced in violation of the leases proves to be unsuccessful. The acknowledgment of the costs and attorneys' fees associated with declaratory judgment actions suggests that the parties were cognizant of and agreeable to the expedited and cost-saving procedures provided to them by summary proceedings under the Real Property Actions and Proceedings Law, as compared with the lengthier and costlier declaratory judgment remedies under CPLR 3001.
VIII. The Plaintiffs' Fourth Cause of Action Alleging Breach of Contract
The plaintiffs argue that the Supreme Court erred in granting dismissal of the fourth cause of action, which alleged breach of contract. Notably, the language of Paragraph 67(H) in the lease riders only addresses waiver of a "declaratory judgment action," which is conceptually distinct from and not inclusive of a breach of contract action.
Indeed, declaratory judgment actions and breach of contract actions are different legal concepts involving different alleged harm and different forms of redress. The declaratory judgment action exists for the purpose of declaring the rights and other legal relations of the parties to a justiciable controversy, for the primary purpose of stabilizing an uncertain or jural relationship (see CPLR 3001; Dupigny v St. Louis, 115 AD3d 638, 640; Chanos v MADAC, LLC, 74 AD3d 1007, 1008). If the plaintiff in a declaratory judgment action is not entitled to the declaration sought, the remedy is not a dismissal of the complaint, but a declaration of the rights of the parties, whatever those rights may be (see 200 Genesee St. Corp. v City of Utica, 6 NY3d 761, 762; Stahlbrodt v Commissioner of Taxation & Fin. of State of N.Y., 92 NY2d 646, 652; La Lanterna, Inc. v Fareri Enters., Inc., 37 AD3d 420, 423; Nadel v Costa, 91 AD2d 976). By contrast, breach of contract actions call upon the court to determine questions of breach, liability, and, in the event of liability, money damages. Although the prayers for relief are different for declaratory judgment and breach of contract actions, both grounds may be pursued by a plaintiff in a single complaint, as CPLR 3014 clearly permits the pleading of alternative and inconsistent causes of action (see e.g., PK Rest., LLC v Lifshutz, 138 AD3d 434; Centro Empresarial Cempresa S.A. v América Móvil, S.A.B. de C.V., 76 AD3d 310, 328, affd 17 NY3d 269).
Here, the plaintiffs argue that they asserted a free-standing cause of action against the defendants alleging breach of contract, which the Supreme Court wrongfully granted dismissal of on summary judgment. The complaint alleges that the defendant breached the contract by failing to complete necessary work to obtain a new certificate of occupancy, which was required to convert the premises from an interim multiple dwelling under the "Loft Law" to commercial space. The plaintiffs further allege that the defendant's failure to complete the work placed them, and their [*7]patrons, "at risk." Despite these allegations, we find no specific language in the parties' leases addressing the alleged obligations that the plaintiffs attribute to the defendant.
In any event, we agree with the Supreme Court that the fourth cause of action essentially sought declaratory relief that the plaintiffs were not in breach of contract or were excused from a finding of breach. The nature of an action or remedy does not necessarily depend upon the nomenclature used by a party, but instead, upon the character of the allegations to determine its true nature (see Pink v Title Guar. & Trust Co., 274 NY 167, 173; Matter of Dandomar Co., LLC v Town of Pleasant Val. Town Bd., 86 AD3d 83, 90). The true nature of the fourth cause of action, while cloaked in breach of contract nomenclature, was, in fact, a disguised request for a declaratory judgment, which the plaintiffs waived in Paragraph 67(H) in the lease riders. Accordingly, under the circumstances of this case, the court properly granted that branch of the defendant's cross motion which was for summary judgment dismissing the fourth cause of action.
IX. Conclusion
The plaintiffs' remaining contentions are without merit or have been rendered academic in light of our determination.
In light of the foregoing, the order is affirmed.
CHAMBERS and DUFFY, JJ., concur.
ORDERED that the order is affirmed, with costs.
CONNOLLY, J., dissents, and votes to reverse the order, on the law, grant the plaintiffs' motion for a Yellowstone injunction (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630), and deny the defendant's cross motion for summary judgment dismissing the complaint, with the following memorandum:
In my view, a broad provision in a commercial lease providing that the tenant waives its right to seek declaratory relief with respect to any provision of the lease, or with respect to any notice sent pursuant to the provisions of the lease, violates public policy and is, therefore, unenforceable. Accordingly, I respectfully dissent.
I
The plaintiffs are two related entities that have operated a Foodtown supermarket at a building located at 159 North 3rd Street, also known as 241 Bedford Avenue, also known as 160 North 4th Street, in Brooklyn (hereinafter the subject property or the subject building) since 2010. On April 7, 2010, the plaintiff 159 MP Corp. entered into a 20-year "Standard Form of Store Lease" for a 10,000-square-foot unit in the subject building with the former landlord, BFN Realty Associates, LLC (hereinafter BFN), for use as a supermarket. Simultaneously, the plaintiff 240 Bedford Ave Realty Holding Corp. entered into a nearly identical 20-year lease for a 3,000-square-foot unit in the subject building for use as "supermarket accessory storage." Both leases contained options permitting the plaintiffs to extend the leases for an additional 10 years (for a total of 30 years). Additionally, the riders to the leases contained the following clause:
"Tenant waives its right to bring a declaratory judgment action with respect to any provision of this Lease or with respect to any notice sent pursuant to the provisions of this Lease. Any breach of this paragraph shall constitute a breach of substantial obligations of the tenancy, and shall be grounds for the immediate termination of this Lease. It is further agreed that in the event injunctive relief is sought by Tenant and such relief shall be denied, the Owner shall be entitled to recover the costs of opposing such an application, or action, including its attorney's fees actually incurred, it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings" (emphasis added).
At some point after the leases were executed, the defendant, Redbridge Bedford, LLC,
became the successor-in-interest to BFN.
On or about March 12, 2014, the defendant served each plaintiff with a "Ten (10) Day Notice to Cure Violations," alleging seven identical lease breaches: (1) building out the premises without obtaining permits or approvals from the Department of Buildings; (2) building the premises without obtaining permits from the Department of Buildings for work related to plumbing for [*8]refrigerators and compressors, electrical work, cooking equipment, gas lines, sprinklers, and HVAC installation; (3) configuring the store premises in violation of building code egress requirements, constituting a danger and fire hazard; (4) combining the two leased premises; (5) venting for cooking equipment, which constitutes a nuisance; (6) venting for cooking equipment through an illegal system, which uses compressors that cause noise and vibrations that interfere with the comfort and safety of other tenants' use of the premises; and (7) failing to provide the Fire Department with access to inspect the sprinkler system. The notices to cure further stated that, if the plaintiffs failed to cure these breaches by March 27, 2014 (within 15 days), the defendant would elect to terminate the tenancies and commence summary proceedings to recover possession of the leased premises.
II
On or about March 19, 2014, the plaintiffs commenced this action by filing a verified complaint asserting four causes of action. The first cause of action sought a judgment declaring that the plaintiffs' leases continued to be in full force and effect, and that there were no violations of the leases. The second cause of action sought preliminary and permanent injunctive relief enjoining the defendant from taking any steps to terminate the plaintiffs' leasehold based upon the notices to cure. The third cause of action alleged that, if the plaintiffs were found to have violated the notices to cure relating to the plaintiffs' configuration and combination of the two leased premises (the 10,000- square-foot unit and the 3,000-square-foot unit), the defendant should be equitably estopped from terminating the lease on that ground, since the defendant and its predecessor, BFN, were aware of and consented and/or acquiesced to the plaintiffs' practice of using the two commercial spaces in conjunction with one another. Finally, in the fourth cause of action, the plaintiffs sought damages of $150,000, alleging that the defendant breached the lease after the New York City Loft Board classified the building as an "interim multiple dwelling," requiring the defendant to obtain a new certificate of occupancy for the building, but that the defendant had failed to complete the work necessary to do so.
By order to show cause dated March 26, 2015, the plaintiffs moved for a Yellowstone injunction (see First Natl. Stores v Yellowstone Shopping Ctr., 21 NY2d 630) tolling and staying the cure period in the default notices and enjoining the defendant from taking any steps to terminate the plaintiffs' tenancies or from commencing summary eviction proceedings. The order to show cause also granted the plaintiffs a temporary restraining order consisting of the foregoing relief. The plaintiffs argued that, as commercial lessees facing termination of a valuable lease, they were entitled to a Yellowstone injunction to preserve the status quo. They contended that the defendant had waived any violations of the lease by accepting rent with full knowledge of the plaintiffs' use and configuration of the premises. They argued that the right to cure must be preserved to ensure that if they prevail on the merits, their success will not be nullified through termination of the lease.
In an affidavit in support, Munzer Elayyan, an officer of both plaintiffs, averred that the plaintiffs were not in default of any obligation under their leases, and that they were ready, willing, and able to cure any defaults should the Supreme Court determine that they had in fact defaulted. Elayyan claimed that BFN was aware of and approved of the plaintiffs' plan to use the two commercial spaces in conjunction with one another. With respect to the allegations in the default notices regarding the build-out of the premises and the plumbing for refrigerators, gas lines, and sprinklers, Elayyan asserted that the defendant's predecessor, BFN, had sought and obtained approval for this work as part of its application for a certificate of occupancy for the subject building, and that the plaintiffs had performed no construction on the subject building, but "merely connected [their] appliances to the mechanicals." With respect to the allegations in the default notices regarding the alleged illegal combining of the two commercial spaces, Elayyan averred that this configuration was explicitly provided for in the leases, and the space had been configured that way since prior to the defendant's purchase of the subject property. Elayyan claimed that the defendant's allegations regarding fire hazards were without merit, and that the plaintiffs never denied the Fire Department access to the sprinkler system. Elayyan surmised that, "[w]ith more than twenty years left on the Plaintiffs['] Lease, the [defendant's] sudden objection to our business practices is beyond disingenuous. It is patently obvious that [the defendant] has realized how valuable our leasehold is and has chosen to embark on a course of conduct to drive us from possession so that it can profit from our hard work." Elayyan further claimed that "[t]he Notice to Cure . . . is nothing more than a strong-arm tactic to recover the valuable commercial space." Elayyan noted that the default notices failed to set forth the dates, times, or specific details regarding the alleged lease violations, compromising the plaintiffs' ability to prepare a defense to the allegations.
The plaintiffs also submitted the affidavit of Iraj Issapour, a professional engineer, who averred, based upon his review of various New York City Department of Buildings (hereinafter DOB) filings and permits, that permits for the duct hood, gas lines, HVAC, and plumbing were in fact issued by the DOB before the plaintiff took occupancy of the subject property. Issapour averred that, in his professional opinion, the configuration of the building was not a fire hazard, and that the only remaining work to be done under the pending certificate of occupancy was the defendant's responsibility. Specifically, Issapour averred that, in order for the application for a certificate of occupancy to proceed, the defendant was required to submit a certain report with photographs to the DOB, to pay certain fees to the Borough Commissioner, and await determinations regarding whether revised plans would be required.
The defendant opposed the plaintiffs' motion and cross-moved for summary judgment dismissing the complaint, arguing that the plaintiffs waived the right to seek a Yellowstone injunction by virtue of the clause of the leases waiving the right to bring a declaratory judgment action, and that, by the very act of commencing this declaratory judgment action, the plaintiffs were in violation of the leases. The defendant also served an answer asserting an affirmative defense that the plaintiff had "contractually waived the right to seek injunctive relief."
In reply and in opposition to the defendant's cross motion, the plaintiffs argued that the relevant provision of the lease waived the right to seek declaratory relief, but did not explicitly waive the right to seek an injunction or Yellowstone relief. The plaintiffs argued that a blanket "covenant not to sue" was unenforceable as against public policy and, in any event, only its first cause of action truly sought declaratory relief. With respect to the parties' agreement that all disputes would be adjudicated by summary proceeding, the plaintiffs argued that their causes of action premised upon equitable estoppel and breach of contract could not be asserted in a summary proceeding. Thus, the plaintiffs argued that the clause waiving the right to seek a declaratory judgment must be the product of mutual mistake. Finally, the plaintiffs argued that the defendant itself was in breach of the lease for failing to obtain a certificate of occupancy for the building and, therefore, the defendant should be estopped from enforcing the waiver provision.
In an order dated January 29, 2015, the Supreme Court denied the plaintiffs' motion and granted the defendant's cross motion. The court reasoned:
"Although there is no express prohibition against seeking a Yellowstone injunction in the subject waiver clause, it is clear from its terms that plaintiffs waived the right to bring a declaratory judgment action relating to the leases and/or any Notices to Cure and that the parties agreed to resolve their disputes in a summary proceeding should such issues arise. By waiving the right to bring a declaratory judgment action, plaintiffs implicitly waived any entitlement to a Yellowstone injunction."
The court found that the waiver provision did not deny the plaintiffs all legal redress since they could raise any defenses they may have in a commercial summary proceeding to evict them. The court also rejected the plaintiffs' allegation that the waiver provision was the result of a mistake, noting that there was no allegation that the agreement was procured by fraud on the part of the defendant.
III
The plaintiffs appeal, arguing, among other things, that the waiver provision violates public policy and, therefore, is not enforceable. The plaintiffs contend that a contractual provision, such as the one at bar, prohibiting any type of declaratory relief with respect to the contract itself unreasonably forecloses a party's ability to seek guidance from the courts on the rights and obligations of the parties.
In response, the defendant contends that public policy strongly favors the freedom to contract, and this Court should find that the plaintiffs validly waived their right to seek declaratory relief and a Yellowstone injunction. The defendant contends that the plaintiffs are sophisticated commercial entities that undoubtedly extracted valuable concessions from the defendant's predecessor in exchange for the waiver provision at issue.
IV
While the waiver at issue in this case does not expressly refer to or prohibit the plaintiff from obtaining a Yellowstone injunction, as the Supreme Court correctly noted, by prohibiting the plaintiff from seeking declaratory relief, the waiver constitutes an implicit bar to obtaining Yellowstone relief, which is the primary relief the plaintiffs seek in this action.
As discussed by the majority, in First Natl. Stores v Yellowstone Shopping Ctr. (21 NY2d 630), the Court of Appeals held that, pending resolution of a declaratory judgment action to determine the parties' obligations under the lease, the plaintiff tenant's failure to obtain a temporary restraining order preserving the status quo prior to the expiration of the 10-day cure period deprives the courts of the legal or equitable power to revive the lease or to extend the cure period (see id. at 637-638).
The Yellowstone decision implicitly created a strategic remedy for commercial tenants to preserve their valuable property interest in the leasehold when served with a notice to cure defaults that are in dispute. By obtaining an injunction staying the running of the cure period prior to its expiration, a tenant could adjudicate the merits of the alleged lease default and, even if the tenant was ultimately found in default, it could still utilize the unexpired cure period to avoid lease termination. "While seemingly unremarkable, the Yellowstone case ushered in a new era of commercial landlord-tenant law in New York State. As a result of this decision, tenants developed the practice of obtaining a stay of the cure period before it expired to preserve the lease until the merits of the dispute could be resolved in court" (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d 508, 514, citing Post v 120 E. End Ave. Corp., 62 NY2d 19, 25). "Because Civil Court does not have jurisdiction to grant injunctive relief, stay applications necessarily [are] made in Supreme Court in conjunction with an action for declaratory judgment" (Post v 120 E. End Ave. Corp., 62 NY2d at 25).
"A Yellowstone injunction maintains the status quo so that a commercial tenant, when confronted by a threat of termination of its lease, may protect its investment in the leasehold by obtaining a stay tolling the cure period so that upon an adverse determination on the merits the tenant may cure the default and avoid a forfeiture" (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 514). While the Yellowstone injunction stays the cure period, it does not stay or alter the parties' remaining rights and obligations under the lease (see id. at 514-515; Waldbaum, Inc. v Fifth Ave. of Long Is. Realty Assoc., 85 NY2d 600, 606). "It is well settled that in order to obtain a Yellowstone injunction, the moving party must demonstrate that: (1) it holds a commercial lease; (2) it received from the landlord either a notice of default, a notice to cure, or a threat of termination of the lease; (3) it requested injunctive relief prior to the termination of the lease; and (4) it is prepared and maintains the ability to cure the alleged default by any means short of vacating the premises" (225 E. 36th St. Garage Corp. v 221 E. 36th Owners Corp., 211 AD2d 420, 421; see Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 514). "[T]he courts, in granting Yellowstone relief, require far less than the showing normally required for obtaining preliminary injunctive relief" (225 E. 36th St. Garage Corp. v 221 E. 36th Owners Corp., 211 AD2d at 421), which "reflect[s] and reinforce[s] the limited purpose of a Yellowstone injunction: to stop the running of the applicable cure period" (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 514).
V
With this background, I turn my analysis to the issue of whether the waiver at issue violates public policy. The trial courts are split, and no appellate court until now has reached the issue [FN1]. For the reasons that follow, I conclude that the plaintiffs' broad waiver of the right to seek [*9]declaratory relief with respect to any provision of the lease, or with respect to any notice sent pursuant to the provisions of the lease, violates public policy and, therefore, is unenforceable.
"Generally, parties may contract as they wish and the courts will enforce their agreements without passing on the substance of them" (New England Mut. Life Ins. Co. v Caruso, 73 NY2d 74, 81; see Selzer v Baker, 295 NY 145, 149). "Their promises are unenforceable only when statute or public policy dictates that the interest in freedom to contract is outweighed by an overriding interest of society" (New England Mut. Life Ins. Co. v Caruso, 73 NY2d at 81; see 15-79 Corbin on Contracts § 79.1 ["The law has a long history of recognizing the general rule that certain contracts, though properly entered into in all other respects, will not be enforced, or at least will not be enforced fully, if found to be contrary to public policy"]). "Freedom of contract itself is deeply rooted in public policy, however, and therefore a decision to refrain from enforcing a particular agreement depends upon a balancing of the policy considerations against enforcement and those favoring the encouragement of transactions freely entered into by the parties" (New England Mut. Life Ins. Co. v Caruso, 73 NY2d at 80).
There is no bright-line rule for determining whether a contractual clause violates public policy or for discerning the public policy with respect to a given subject matter.
"The meaning of the phrase public policy' is vague and variable; there are no fixed rules by which to determine what it is. It has never been defined by the courts, but has been left loose and free of definition, in the same manner as fraud. It is only in clear cases that contracts will be held void. The principle must be cautiously applied to guard against confusion and injustice" (Steele v Drummond, 275 US 199, 204 [citations omitted]).
"It may . . . be taken for granted that whenever our courts are called upon to scrutinize a contract which is clearly repugnant to sound morality and civic honesty, they need not look long for a well-fitting definition of public policy, nor hesitate in its practical application to the law of contracts" (Veazey v Allen, 173 NY 359, 368). Nevertheless, to discern public policy, courts may look to legislation, regulations and ordinances, and judicial precedent (see 15-79 Corbin on Contracts § 79.2).
"[A] court may determine a public policy and may determine that a particular contract contradicts that policy by simply evaluating the prevailing practices and notions of the community as to what is in the interest of the general welfare of the society. Thus, the court may, in effect, find and declare the public policy of the jurisdiction" (id.).
Further, concerning the waivability of rights, a distinction has been drawn between rights which benefit an individual and rights which benefit society in general. "It is well settled that a party may waive a rule of law, a statute, or even a constitutional provision enacted for his benefit or protection, where it is exclusively a matter of private right which is involved, and no considerations of public policy come into play" (Hammelburger v Foursome Inn Corp., 76 AD2d 646, 649, mod 54 NY2d 580, citing Sentenis v Ladew, 140 NY 463, 466). However, "when a right has been created for the betterment or protection of society as a whole, an individual is incapable of waiving that right; it is not his to waive" (Hammelburger v Foursome Inn Corp., 76 AD2d at 649 [emphasis added], citing Parthey v Beyer, 228 App Div 308, 312, and Sturm v Truby, 245 App Div 357, 359).
By way of example, the contrasting public policy considerations between private rights and rights for the protection of society as a whole are demonstrated in John J. Kassner & Co. v City of New York (46 NY2d 544), where the Court of Appeals held that parties could contractually shorten, but not lengthen, a statute of limitations. "Although the Statute of Limitations is generally viewed as a personal defense to afford protection to defendants against defending stale claims,' it also expresses a societal interest or public policy of giving repose to human affairs' (id. at 550, quoting Flanagan v Mt. Eden Gen. Hosp., 24 NY2d 427, 429 [emphasis added]). Although an [*10]agreement to shorten the applicable statute of limitations "does not conflict with public policy but, in fact, more effectively secures the end sought to be attained by the statute of limitations," parties may not agree to extend the statute of limitations by, in effect, making a bargain that a statute founded upon public policy should be "inoperative" (John J. Kassner & Co. v City of New York, 46 NY2d at 551 [internal quotation marks omitted]). In its public policy analysis, the Court of Appeals noted that, in agreeing to extend a statute of limitations before a claim has even arisen, "there is a greater likelihood that a waiver' or extension of the defense . . . was the result of ignorance, improvidence, an unequal bargaining position or was simply unintended" (id. at 552).
The contractual waiver at issue in the case at bar is notable in that it facially prohibits the plaintiffs from commencing a declaratory judgment action with respect to any provision of the lease or notice sent pursuant thereto. However, the right to bring a declaratory judgment action is not personal to an individual, but, rather, such action serves important societal functions. "The general purpose of the declaratory judgment is to serve some practical end in quieting or stabilizing an uncertain or disputed jural relation either as to present or prospective obligations" (James v Alderton Dock Yards, 256 NY 298, 305; see Chanos v MADAC, LLC, 74 AD3d 1007, 1008). The declaratory judgment action serves an important public policy function in resolving controversies before they escalate into a breakdown of the contractual relationship: "[The declaratory judgment action] was designed to supply the need for a form of action that would set controversies at rest before they led to the repudiation of obligations, the invasion of rights and the commission of wrongs" (Post v Metropolitan Cas. Ins. Co., 227 App Div 156, 159 [discussing Civil Practice Act § 473, the predecessor to CPLR 3001], affd 254 NY 541). Thus, the declaratory judgment action promotes civility in contractual relations, allowing the parties to obtain a judicial interpretation of their rights and obligations so that, rather than suing for damages or specific performance after the fact, they may fulfill their promises to one another. "It is in fact a paradox to insist that P pursue D by coercive means when all P wants is a judicial statement resolving their dispute. It's like ordering a person to threaten a neighbor with a stick when all he wants to do is have the neighbor sit down to table and reason together" (Siegel, NY Prac § 436 [5th ed 2011]). In my view, contracting parties should not be permitted to execute broad waivers of the important right to seek declaratory relief.
More specific to the landlord-tenant context, the declaratory judgment action, together with the Yellowstone injunction, serve a valuable public policy role in relations between commercial landlords and tenants, providing a mechanism for a commercial tenant to "protect its valuable property interest in the lease while challenging the landlord's assessment of its rights" (225 E. 36th St. Garage Corp. v 221 E. 36th Owners Corp., 211 AD2d at 421). Without the Yellowstone injunction, "[t]he alternative for the tenant [is] to stand on his rights without correcting the violation, wait for the landlord to start summary proceedings in Civil Court and then defend against the landlord's claim in that court. If he [wins], well and good; if he [loses] he forfeit[s] everything because the lease [has] terminated" (Post v 120 E. End Ave. Corp., 62 NY2d at 25). However, where the Yellowstone injunction is employed, "[i]f the tenant prevail[s] he ha[s] no further need for a stay. If he los[es], he [may] either cure[ ] the default during whatever part of the cure period remain[s] or the lease expire[s] and he [is] subject to removal by summary proceeding" (id.).[FN2]
Insofar as the waiver provision at issue effectively divests the Supreme Court of jurisdiction to entertain a declaratory judgment action, the relevant public policy considerations bear some resemblance to arbitration clauses, which also divest courts of jurisdiction. For a period of history lasting into the early twentieth century, the courts of this country followed an English doctrine that categorically refused to enforce arbitration agreements, or any other agreement that served to oust the courts of jurisdiction (see 15-83 Corbin on Contracts § 83.5 [2016] ["Though many courts did not analyze the reasoning or value of the doctrine, those that did probably viewed the ouster doctrine as a doctrine preventing parties from appointing any entity other than the court [*11]from performing tasks traditionally reserved for the courts"]; see also Allied-Bruce Terminix Cos. v Dobson, 513 US 265, 270). However, under federal law and in most states, "enforcement of arbitration agreements no longer offends state public policy because the states have abandoned any anti-arbitration sentiment" (15-83 Corbin on Contracts § 83.5 [2016]). Indeed, in New York, contractually negotiated arbitration clauses are not only regularly enforced, but are encouraged as part of the public policy of the State (see Westinghouse Elec. Corp. v New York City Tr. Auth., 82 NY2d 47, 53 ["It is firmly established that the public policy of New York State favors and encourages arbitration and alternative dispute resolutions"]). Notably, the availability of some form of judicial review has been an important public policy consideration in upholding agreements to arbitrate (see id. at 54-55 ["we conclude only that public policy has not been transgressed in this case, particularly because of the provision for judicial review of the adjudicator's decision"]; see also Yonkers Contr. Co. v Port Auth. Trans-Hudson Corp., 87 NY2d 927, 930).
In contrast to an agreement to arbitrate, here, the contractual waiver fully divests the Supreme Court of jurisdiction to hear a declaratory judgment action brought by the plaintiffs. While a total waiver of any form of judicial review would almost certainly violate public policy, here, the waiver also provides that "it is the intention of the parties hereto that their disputes be adjudicated via summary proceedings." The question thus becomes whether a summary proceeding, standing alone, provides an adequate form of judicial review for disputes between a landlord and a tenant regarding a contested notice to cure. Since the purpose of a lease is to protect a tenant's interest in real property, meaningful judicial review must provide the tenant with the opportunity to proactively protect that interest. For the reasons that follow, I find that a summary proceeding does not provide an adequate substitute for the important rights forfeited by the broad waiver at issue here.
The term "summary proceeding" is shorthand for a "Summary Proceeding to Recover Possession of Real Property" pursuant to RPAPL article 7. "The purpose of the summary proceeding is to afford a means of obtaining a speedy determination and adjudication of issues relating to the right to possession of real property" (12-129 Warren's Weed New York Real Property § 129.04 [2017]). Thus, the primary issue in a summary proceeding is the right to possession of the premises (see id.; see also Jones v Gianferante, 305 NY 135, 139). A summary proceeding "may be brought by" an enumerated list of persons, including, as relevant to the instant matter, the "landlord or lessor" or "the lessee of the premises, entitled to possession" (RPAPL 721[1], [10] [emphasis added]). Actions by the lessee, i.e., a tenant, under this section are limited to out-of-possession lessees against, for example, a prior tenant who has held over and continued possession after his or her term (see e.g. Matter of Hispano Americano Adv. v Dryer, 112 Misc 2d 936, 938 [Civ Ct, NY County] [discussing legislative history of RPAPL 721(10)]). Therefore, since a lessee in the plaintiffs' position, faced with a notice to cure that he or she believes is baseless, has no standing to bring a summary proceeding, enforcement of the waiver provision at issue would leave the plaintiffs with no affirmative judicial remedy. In other words, the plaintiffs, having been boxed into a corner, would be entirely dependent on the defendant commencing a summary proceeding in order to bring the issue of the validity of a notice to cure before a court. A landlord in this situation could serve successive notices to cure on a tenant, leaving the tenant in a metaphorical limbo, without recourse to initiate judicial proceedings for a determination of the tenant's rights. Although a tenant in this scenario could theoretically remain in possession so long as the landlord accepted rent, the tenant would be faced with great uncertainties with respect to any decision-making related to improving the property, accepting deliveries of new stock or merchandise, or the negotiation of any type of long-term agreement with customers or suppliers. This condition is precisely the type of "uncertain or disputed" jural relation that a declaratory judgment action seeks to rectify (James v Alderton Dock Yards, 256 NY at 305). Under the circumstances presented here, it would be contrary to public policy to permit parties in the plaintiffs' position to waive their right to seek declaratory relief and, by extension, a Yellowstone injunction.
My colleagues in the majority hold that, since the parties were sophisticated commercial entities, they were free to waive the right to seek declaratory relief. However, since public policy protects the rights of society, the sophistication of the parties is not an appropriate consideration. While a party's sophistication may bear on, for instance, the issue of whether a contract is unconscionable (see e.g. K.I.D.E. Assoc. v Garage Estates Co., 280 AD2d 251, 254), a party's level of sophistication does not grant it license to enter into contracts contrary to public policy (see e.g. 172 Van Duzer Realty Corp. v Globe Alumni Student Assistance Assn., Inc., 24 NY3d 528, 532, 536 [matter involving a "one-year commercial rental lease agreement" remitted for hearing on issue of [*12]whether liquidated damages clause constituted a penalty in violation of public policy]; John J. Kassner & Co. v City of New York, 46 NY2d at 547 [agreement between "the plaintiff John J. Kassner & Co., a professional engineering corporation," and the City of New York violated public policy])[FN3]. In addition to large sophisticated entities, the law also protects small businesspeople from the consequences of contracts that are against public policy. For example, in Surdeanu v 137 E. 110th St., LLC (Sup Ct, NY County, Richter, J., index No. 116029/02), where the Supreme Court held that a waiver provision nearly identical to the one at bar violated public policy, the tenant was a barber who was apparently doing business as an unincorporated sole proprietorship. Tenants—sophisticated or unsophisticated—should not be bound by harsh waivers that preclude them from affirmatively seeking meaningful judicial review to protect their leasehold, should a dispute with their landlord arise. Courts should not enforce these waivers, which, in my view, were plainly "the result of ignorance, improvidence, an unequal bargaining position[,] or w[ere] simply unintended" (John J. Kassner & Co. v City of New York, 46 NY2d at 551).
Moreover, while the majority enumerates a litany of rights that contracting parties may waive (e.g., forum selection clauses, waiver of the right to a jury trial, rent escalation clauses), none of the examples cited by the majority involve the fundamental and societally critical right of affirmative and meaningful access to the courts for judicial review, or a suitable substitute forum for dispute resolution.
Accordingly, in my view, because enforcement of the contractual waiver at issue in this action would deprive the plaintiffs of any affirmative and meaningful means of accessing the courts, it violates public policy. I take no position on whether a more narrowly tailored contractual waiver pertaining to declaratory relief and/or Yellowstone injunctions would comport with public policy.
Although the defendant contends that, if this Court were to find the waivers unenforceable, the consideration bargained for in exchange for the waivers would have to be restored to it, the leases contain a savings clause that provides: "If any of the provisions of this Lease . . . shall to any extent, be invalid or unenforceable, the remainder of the Lease . . . shall not be affected thereby, and every provision of this lease shall be valid and enforceable to the fullest extent permitted by law." Accordingly, contrary to the defendant's contention, the leases remain otherwise enforceable and valid.
VI
Finally, with respect to the merits of the plaintiffs' motion, I find that they established their entitlement to a Yellowstone injunction by demonstrating that (1) they held commercial leases, (2) they received notices to cure violations and threats to terminate their leases from the defendant, (3) they requested injunctive relief prior to the termination of their leases, and (4) they were prepared to and maintain the ability to cure the alleged defaults by any means short of vacating the premises (see Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 514; 225 E. 36th St. Garage Corp. v 221 E. 36th Owners Corp., 211 AD2d at 421).
Accordingly, in my opinion, the plaintiffs' motion for a Yellowstone injunction should have been granted, the defendants' cross motion for summary judgment should have been denied, and the matter should be remitted to the Supreme Court, Kings County, to set an appropriate undertaking (see Hopp v Raimondi, 51 AD3d 726, 728; Marathon Outdoor v Patent Constr. Sys. Div. of Harsco Corp., 306 AD2d 254, 256).
ENTER:
Aprilanne Agostino
Clerk of the Court



Footnotes

Footnote 1:See Jeffrey Turkel and Joshua Kopelowitz, Are Yellowstone Waivers Enforceable?, NYLJ, Apr. 10, 2014, at 4, col 1.

Footnote 2:The plaintiffs' argument to the Supreme Court that blanket covenants not to sue are unenforceable at law, citing Krape v PDK Labs, Inc. (34 AD3d 751), is distinctly different from the public policy issue they raise on appeal. Krape involved the enforceability of a general release executed upon settlement of a dispute. The papers below never mentioned public policy.

Footnote 3:For this primary reason, we decline to adopt contrary reasoning set forth in Surdeanu v 137 E. 110th St., LLC (Sup Ct, NY County, April 11, 2003, Richter, J., index No. 116029/02).

Footnote 1:Of the two courts that have squarely addressed the issue—both unreported decisions—one found that the waiver violated public policy (see Surdeanu v 137 E. 110th St., LLC, Sup Ct, NY County, Richter, J., index No. 116029/02 ["The Court concludes that this provision is unenforceable as against public policy. . . . [T]he waiver provision here is not limited to Yellowstone injunctions; it would also prevent plaintiff from instituting any declaratory judgment action with respect to the lease. The Court concludes that such a wide ranging waiver of the right to use the court system to seek redress is unenforceable"]), and one found that it did not (see Aloyts v 601 Tenant's Corp., 2007 WL 6938117 [Sup Ct, Kings County, index No. 30043/06] ["While such waiver precludes the defensive tactic of seeking a Yellowstone injunction prior to the expiration of the lease, it was part of the contract which was fully negotiated at arms-length between represented parties. As such, it would not be contrary to public policy to enforce the provisions of the lease under these circumstances"]). The waivers have also come under scrutiny on other grounds, again with differing results (see Malik v Toss 29, Inc.,15 Misc 3d 1112[A], 2007 NY Slip Op 50618[U] [Dist Ct, Nassau County] [holding that it would be unconscionable to enforce the waiver against the tenant, given that the landlord had breached the lease by failing to maintain the building's sewer system]; but see Hamza v Alphabet Soup Assoc., LLC, 2011 WL 1527179 [Sup Ct, NY County, index No. 101398/11] [holding that, although the plaintiff had waived the right to obtain a Yellowstone injunction, he could nevertheless obtain a "regular preliminary injunction"]).

Footnote 2: As with almost any legal tactic, the Yellowstone injunction is capable of being abused by tenants seeking to merely forestall eviction (see Post v 120 E. End Ave. Corp., 62 NY2d at 25). While there is an obvious potential for abuse, the Court of Appeals has noted that the Yellowstone injunction provides "a modicum of protection to landlords as well," since a court issuing a Yellowstone injunction may impose conditions to protect the landlord's interests during the pendency of the litigation (Graubard Mollen Horowitz Pomeranz & Shapiro v 600 Third Ave. Assoc., 93 NY2d at 515).

Footnote 3:Even assuming that the sophistication of the parties is a relevant factor, there is no evidence in the record regarding the sophistication of the ownership or management of the plaintiff supermarket entities.